**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**MICHAEL ANTRANTRINO LEE,**

Plaintiff,

v.

**Civil Action No. 5:21-CV-54**
Judge Bailey

**D. BISHOFF,** Lieutenant;
**B. GAINER,** Correctional Officer;
**CAPTAIN YAEGER;**
**LT. YARBER,** Lieutenant (acting SIA at time),

Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT

### I. Background

The *pro se* plaintiff, a federal inmate then incarcerated at USO Allenwood[1], initiated this action on April 12, 2021, by filing a complaint raising claims under **Bivens** and the Federal Tort Claims Act. [Doc. 1]. On April 22, 2021, the Court issued an Order notifying the plaintiff of the potential consequences of pursuing relief under both **Bivens** and the Federal Tort Claims Act [Doc. 8]. On May 13, 2021, the plaintiff filed his notification that he wished to proceed only with the **Bivens** complaint. [Doc. 11]. On June 2, 2021, the plaintiff was granted leave to proceed *in forma pauperis* [Doc. 14], and on June 29, 2021, he paid the required initial partial filing fee. [Doc. 18].

---

[1] After his complaint was filed, the plaintiff was transferred to USP Canaan. On April 5, 2022, the plaintiff was released from the custody of the BOP.

1

On July 7, 2021, Magistrate Judge Mazzone conducted a preliminary review of this matter, determined that summary dismissal was not appropriate, and entered an Order to Answer, directing that sixty-day summons be issued for service on the defendants. [Doc. 20].   On October 20, 2021, the defendants filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment with a memorandum in support, and exhibits. [Docs. 39 & 40]. Because the plaintiff is proceeding *pro se*, a **Roseboro** Notice was issued, advising the plaintiff of his right to file a response to the defendant's dispositive motion. [Doc. 42].   On December 20, 2021, the plaintiff filed his response with an attached Declaration and exhibits.   [Doc. 61].   On January 3, 2022, the defendants filed a Reply. [Doc. 64].   On January 7, 2022, the plaintiff filed a supplemental response. [Doc. 65]. Also pending is the plaintiff's Combined Motion for Spoilation Sanctions and Adverse Inference on Spoilation of Evidence.   [Doc. 66].

## II. Factual Background

On March 20, 2002, the United States District Court for the Eastern District of North Carolina sentenced the plaintiff to a term of 360 months.   On September 10, 2009, the plaintiff's sentence was reduced to 324 months.   On May 27, 2014, the plaintiff's sentence was further reduced to a term of 262 months.[2]   On April 5, 2022, the plaintiff was released from custody and is now residing in Raeford, North Carolina.

### A. Arrival at FCI Gilmer

On April 16, 2019, the plaintiff was transferred to FCI Gilmer via the Oklahoma Transfer Center.   When the plaintiff arrived at FCI Gilmer, he was the subject of a pending

---

[2] *See* **Lee v. Gomez**, 5:19-CV-175 (N.D. W.Va.).

investigation regarding an incident at a previous institution. The defendants maintain that as a result, the plaintiff was assigned to the Special Housing Unit ("SHU"). [Doc. 40-1 at 22]. In addition, when the plaintiff arrived at FCI Gilmer, he was on a hunger strike which began on April 4, 2019, while he was at the Oklahoma Transfer Center and was initiated based on his allegations that he was refused his inhaler, naproxen, and other property. [Doc. 40-1 at 131]. On April 11, 2019, the plaintiff stated that he was on a hunger strike due to the way his food was handled. On April 19, 2019, after arriving at FCI Gilmer, he said that was on a hunger strike because he "was sent to SHU for no reason" and did not receive orthopedic shoes. On April 25, 2019, the plaintiff stated that he was on a hunger strike because officers staged an assault and then wrote a fictitious incident report.[3] [Doc. 40-1 at 2–3].

B. **April 17, 2019, Incident**

On April 17, 2019, at approximately 8:10 a.m., defendant Gainer approached the plaintiff's cell after noting that the plaintiff had covered the camera inside the cell. After approaching the plaintiff's cell, defendant Gainer noted that the plaintiff had also covered his cell window with his mattress. The plaintiff refused defendant Gainer's direct orders to uncover his cell window and submit to restraints. Defendant Bishoff then approached the cell and asked the plaintiff to uncover his window to speak. The plaintiff uncovered the window to speak but covered it back when he was finished talking. The plaintiff then refused another direct order to uncover his window, and stated, "[d]o what you want to do. I'm going to do what I want to do what I have to do. I'm going to f[***] one of you up if you

_____

[3] Document 40-1 is the incident report to which he is referring.

come in here." [Doc. 61-2 at 8]. Because the plaintiff refused staff orders, displayed signs of imminent violence and staff were unable to approach the plaintiff without being placed in danger, the Warden authorized a Use of Force Team to be assembled to enter the cell and place him in restraints.   At approximately 9:44 a.m., confrontation avoidance procedures were initiated. Confrontation avoidance procedures were successful, and the plaintiff agreed to uncover his cell window and submit to restraints. The plaintiff was escorted out of his cell and placed into ambulatory restraints[4] at approximately 10:00 a.m. The Warden was contacted and authorized the continued use of ambulatory restraints until the plaintiff demonstrated a pattern of non-destructive behavior.  At approximately 8:00 p.m., the leg portion of the ambulatory restraints were removed.  At approximately 10:00 p.m., the "black box" portion of the ambulatory  restraints were removed. At approximately 11:30 p.m., the plaintiff was completely released from restraints.  [Doc. 40-1].

**C.  April 17, 2019 Incident Report**

The plaintiff received an incident as a result of the events described above.   Incident Report Number 3246747 charged the plaintiff with Threatening Another with Bodily Harm (Prohibited Code 203) and Refusing to Obey an Order (Prohibited Cide 307). A copy of the report was given to the plaintiff on April 17, 2019, at 12:50 p.m. [Doc. 61-2 at 8].   On April 26, 2019, the United Disciplinary Committee referred the charges to the Disciplinary Officer ("DHO") for further heating and recommended that the plaintiff be sanctioned with the loss of good conduct time, loss of commissary privileges, phone, and visitation, and receives time in disciplinary segregation. [Id.].

---

[4] Ambulatory restraints are a set of wrist and leg restraints that are not rigid and permit the inmate to move around inside of the observation cell.  This type of restraint permits an inmate to use the restroom and walk around while restraining his movement sufficiently such that there is a decreased risk of self-harm, harm to others, or damage to property. [Docs. 40-1 at 4, 177].

The plaintiff requested a staff representative, Mr. Clem, who was his unit manager. In addition, he requested that Inmate Banks be called as a witness.[5] Prior to the hearing, Mr. Clems reviewed the video footage and documented what it revealed between 8:10 a.m. and 9:51 a.m. The DHO hearing was conducted on May 10, 2019.[6] After the hearing, the DHO found that the plaintiff had committed the prohibited act of conduct disruptive to the orderly running of the institution most like threatening another person, Code 299 most like Code 203. [Id. at 4]. The plaintiff was sanctioned with the loss of 27 days of Good Conduct Time, 30 days of disciplinary segregation, and 6 months loss of commissary and phone. [Id. at 5]. There has been no evidence presented that establishes that this disciplinary proceeding has been overturned or expunged.[7] In fact, on August 31, 2021, the plaintiff filed a habeas petition pursuant to 28 U.S.C. § 2241 in the United States District Court for the Middle District of Pennsylvania challenging this incident report. On November 13, 2021,

---

[5] Mr. Banks testified at the hearing that he was in the cell next to the plaintiff and testified that: "I was in the cell next to Lee, I don't remember him saying anything to Gainer." [Doc. 61-2 at 3]. The Court assumes this to be in reference to the allegation that the plaintiff responded to defendant Gainer's order that he uncover his window and submit to his hand restraints by stating: "Do what you gotta do, I'm a do what I gotta do. I'm a f*** one of ya all up if you come in here." [Id. at 4].

[6] According to the DHO summary, Mr. Clem stated that he reviewed the video which "reflected that on April 17, 2019, at 8:10 A.M. Inmate Lee is observed covering the window of the cell door. At 8:10 A.M. Lieutenant Bishoff is seen coming onto the range with Officer Gainer and Officer Miller and Officer Gainer is observed standing in front of the food slot. At 8:27 A.M. inmate Lee uncovers the window. At 8:35 A.M. Officer Frasier is near the cell and the window is uncovered and at 9:51 A.M. Dr. Wagner comes to the cell for confrontation avoidance," [Doc. 61-2 at 2].

[7] As part of his response to the defendants' Motion to Dismiss or for Summary Judgment, the plaintiff attached an Incident Report from FCI Gilmer regarding a July 12, 2019, encounter with his unit counselor which resulted in a charge of Refusing an Order and Being Insolent to a Staff. [Doc. 61-7 at 2]. That report was handled by the Unit Disciplinary Committee ("UDC") because it did not involve the loss of good conduct time. [Id. at 3]. His Regional Administrative Remedy Appeal was granted because the incident report had been expunged by the UDC. [Id. at 4].

the Court found that the plaintiff was accorded all of his due process rights and there was some evidence supporting the decisions made by the DHO.  Accordingly, the petition was denied.  The plaintiff filed a Notice of Appeal, and on February 23, 2022, the Court of Appeals dismissed the case pursuant to F.R.A.P. 3(a) for failure to pay the filing fee. *See Lee v. Bradley*, 1:21-cv-1504-SHR-SM (M.D. Pa.) (available on PACER).

### III. The Pleadings

#### A.    The Complaint

Liberally construed, the plaintiff makes several allegations which he contends establish violation of his Fourth, Fifth and Eighth Amendment rights.  More specifically, he alleges that various defendants violated his Fourth Amendment rights by falsifying official documents and misrepresenting official documents in connection with Incident Report Number 3246747.  With respect to the Fifth Amendment, the plaintiff alleges that various defendants denied him equal protection of the laws and maintains that the "incident" was racially motivated. Finally, he alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment when he was chained up like an animal under false pretenses and endured pain and suffering for nearly 14 hours in a very cold cell with no linens. He also alleges that his restraints were illegally tightened without medical supervision. For relief, he seeks $250,000  from each defendant as compensatory damages and $500,000 from each defendant as punitive damages for a total sum of $3,000,000.

**B. Defendants' Motion to Dismiss, or Alternatively, Motion for Summary Judgment**

In response to the complaint, the defendants argue that the plaintiff has failed to state a valid Eighth Amendment claim because the actions of defendants Bishoff, Gainer, Yaeger and Yarber did not rise to the level of excessive force. In addition, the defendants argue that the plaintiff's allegation that official documents were falsified in violation of the Fourth Amendment does not state a cognizable *Bivens* claim, because even if true, an inmate has no constitutional right prohibiting false disciplinary charges against him. The defendants also argue that the plaintiff's Fifth Amendment claims of racial animus are not cognizable under *Bivens*. Finally, the defendants argue that the plaintiff's Fourth Amendment and Fifth Amendment claims must be dismissed because claims are not cognizable Bivens claims under *Ziglar v. Abbasi*, 137 S.Ct. 1842 (2017).

**B.**   **Plaintiff's Response in Opposition**

In response, the plaintiff emphasizes that the "assault" began at approximately 7:45 am-8:00 am when defendant Gainer placed him in hand restraints to be escorted to the SHU medical room to be assessed/evaluated for his hunger strike. The plaintiff correctly notes that the defendants did not address this portion of his complaint and argues that Gainer's actions clearly violated his Eighth Amendment rights.[8]

_____

[8] In his complaint, the plaintiff alleged that during the escort to medical, defendant Gainer started walking fast and bending up on the cuffs and causing him pain to his surgically repaired right wrist. [Doc. 1 at 11]. The plaintiff alleged that defendant Gainer, nonetheless, kept pulling up on the cuffs. When they arrived at the medical room, the plaintiff acknowledged that he told the nurse that he refused as defendant Gainer was putting him on the scale. [Id.]. The plaintiff alleges defendant Gainer then intentionally pushed him against the wall. [Id.].

The plaintiff also argues that there was no need for use of calculated force because he voluntarily agreed to cuff up.  He maintains that it is undisputed that he was chained up in ambulatory full restraints (handcuffs, waist chains/with black box, and leg restraints) for over 14 hours and suffered cuts, scrapes, bruises, and injury to his wrist. [Doc. 61 at 5]. The plaintiff then addresses the elements to be evaluated to determine whether defendants are guilty of excessive force and argues that he has demonstrated that they are.

With respect to his claim of retaliation, the plaintiff argues that he has a First Amendment right to be free from retaliation for filing grievances and engaging in a hunger strike. The plaintiff goes on to argue that under BOP policy, he did not have to be housed in the SHU based upon an incident report that was pending when he was transferred to FCI Gilmer.  The plaintiff clarifies this by noting that the only Incident Report that mandates housing in the SHU is a 100 series violation, and his pending violation was a 200 series. The plaintiff also maintains that in 2009 and 2010 he was transferred with a pending incident report and was not placed in the SHU but instead was placed in general population.  The plaintiff then argues the defendants placed him in the SHU with the intent to bring him harm and to deter him from filing complaints and engaging in a hunger strike, thereby violating his Fifth Amendment rights.

The plaintiff also argues that the defendants violated his Fourth Amendment rights by detaining him in the SHU by way of deliberately making false statements. The plaintiff, in effect, argues that once the "false" statements in the incident report are removed, the defendants lacked jurisdiction to have him placed in ambulatory restrains and deprive him

of good conduct time.  The plaintiff also maintains that he was treated differently from other inmates at the same facility, and the staff/defendants violated his equal protection rights. As support for this conclusion, the plaintiff maintains that there were other inmates who arrived with pending incident reports, who were placed in general population and were never housed in the SHU.

Finally, the plaintiff undertakes a lengthy analysis of why his claims do not present a new **Bivens** context.  Therefore, he maintains that his Fourth and Fifth Amendment claims are not barred by **Abbasi**.

C.   **Defendants' Reply**

The defendants indicate that they wish to stand upon the fact and arguments asserted in their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment and the Memorandum filed in support thereof.   However, they also address certain arguments raised in the plaintiff's response.

First, they note that although the plaintiff concedes that the only "use of force" employed by the defendants was placing him in ambulatory full restraints, he continues to argue incorrectly that he was subjected to cruel and unusual punishment. The defendants argue that the plaintiff's response fails to acknowledge that the **Bivens** claims against defendants Bishoff, Gainer, Yaeger, and Yarber are subject to dismissal because their actions did not rise to the level of excess force in violation of the Eighth Amendment.

Second, the defendants maintain that the allegations regarding verbal abuse and retaliatory actions based on racial animus must be dismissed because those claims do not

9

amount to cognizable *Bivens* claims  Additionally, the defendants reiterate that these claims must be dismissed under *Abbasi*.

Third, the defendants emphasize that all of the individual defendants are entitled to qualified immunity because the plaintiff cannot establish constitutional violations under any of the facts he alleges.

### III. <u>Standard of Review</u>

#### A. <u>Motion to Dismiss - Fed.R.Civ.P. 12(b)(6)</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." ***Republican Party of N.C. v. Martin***, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. ***Mylan Labs, Inc. v. Matkari***, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also* ***Martin***, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" ***Bell Atl. Corp. v. Twombly***, 550 U.S. 544, 555 (2007) (quoting ***Conley v. Gibson***, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." ***Conley***, 355 U.S. at 45–46. In ***Twombly***, the

10

United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Conley*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Id*. (citations omitted), to one that is "plausible on its face," [*Id*. at 570], rather than merely "conceivable." *Id*. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in *Ashcroft v. Iqbal*, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. *Id*.

The plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520–1 (1972) (per curiam); *Erikson v. Pardus*, 551 U.S. 89, 94 (2007); *Loe v. Armistead*, 582 F.2d 1291 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, *Haines*, 404 U.S. at 520, even under this less stringent standard, a *pro se*

complaint is still subject to dismissal. *Id*. at 520–21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. ***Barnett v. Hargett***, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for him or her. ***Small v. Endicott***, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." ***Beaudett v. City of Hampton***, 775 F.2d 1274 (4th Cir. 1985).

## B. Motion for Summary Judgment

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322–23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986).

In ***Celotex***, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. ***Celotex***, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." ***Matsushita***, 475 U.S. at 586. The nonmoving

12

party must present specific facts showing the existence of a genuine issue for trial. *Id*. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. *Id*. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587.

## IV. <u>Analysis</u>

### <u>A</u>.    <u>Excessive Force</u>

Analysis of a claim for use of excessive force begins with "identification of the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of a prisoner's claim must be "judged by reference to th[is] constitutional standard…rather than to some generalized 'excessive force' standard." *Graham*, 490 U.S. at 394; *see e.g.*, *Whitley v. Albers*, 475 U.S. 312, 318–326 (1986) (claims of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

To state an Eighth Amendment claim, an inmate must prove two factors: (1) objectively, the alleged punishment or act is sufficiently serious that it violates contemporary standards of decency; and (2) objectively, the prison official must have a

sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The subjective component of the claim requires an inmate to demonstrate that the force used by an institutional official, "inflicted unnecessary and wanton pain and suffering." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The question of whether the measure taken inflicted unnecessary and wanton pain and suffering turns on "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In determining whether a prison official acted maliciously and sadistically, the court should consider the following: "the need for application of force, the relationship between the need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts to temper the severity of a forceful response." *Hudson*, 503 US at 7 (internal quotation marks omitted).

In addition, the inmate must prove the correction officer's actions were "'objectively harmful enough to offend 'contemporary standards of decency.'" *Stanley v. Hejirika*, 134 F.3d. 629, 634 (4th Cir. 1998) (quoting *Hudson*, 503 U.S. at 8). In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id*. (quoting *Wilson v. Seiter*, 501 US 294, 298 (1991)). When prison officials used force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated … This is true whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. However, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a

prisoner's constitutional rights.'" *Id*. (quoting ***Johnson v. Glick***, 481 F.2d 1028, 1033 (2d Cir. 1973)).

In the instant case, the plaintiff has made two separate claims of excessive force. The first is against defendant Gainer and involves an alleged incident that occurred on April 17, 2019, at 7:45 a.m., when the plaintiff was escorted to the SHU medical room for evaluation of his hunger strike. The defendants have not addressed this incident in either their Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, nor in their reply to the plaintiff's response. Accordingly, there remains a question of fact as to this element of the complaint, and the plaintiff's claim against defendant Gainer for the first allegation of excessive force survives the defendants' Motion, and this claim should be permitted to move forward.

The second claim involves the events that occurred after the plaintiff was returned to his cell from the SHU medical room. The plaintiff does not dispute that he covered his cell window[9], and what little of the stationary video in the plaintiff's cell which still exists, clearly establishes that the plaintiff used something to cover the camera. When staff attempted to persuade the plaintiff to uncover his cell window, he threatened staff. Although the Warden then authorized a calculated use of force team, the staff minimized the amount of force used when they successfully engaged in confrontation avoidance and the plaintiff agreed to submit to hand restraints.

---

[9] In his complaint, the plaintiff notes that he "briefly covered the cell window to try to get staff to come and contact the SIA or Psychology." [Doc. 1 at 12].

The plaintiff was then escorted out of his cell and placed into ambulatory restraints. After the plaintiff was placed into restraints, he implied several times that he was suicidal.[10] The Warden authorized the continued use of ambulatory restraints, and as required by BOP Program Statement, the plaintiff was checked every 15 minutes, and observations were documented. [Doc. 40-1 at 195–197]. At 8:00 p.m., his leg restraints were removed because he had begun to show a pattern of calm behavior. [Id. at 199]. At 10:00 p.m., the black box was removed. [Id.]. The plaintiff was removed from all restraints at 11:30 p.m. [Id. at 201].

Although the plaintiff alleges that he was in pain for weeks from scratches, cuts, abrasions, and bruises, the medical records contradict his allegation. On April 17, 2019, he was evaluated by medical at 12:30 pm. There is no notation of any injuries, and no report from the plaintiff that he was in pain. [Doc. 40-1 at 108]. At 6:00 pm that same day, the plaintiff was seen by medical for a restraint check. The plaintiff specifically denied any pain or discomfort. In addition, he was observed ambulating around the cell independently with steady gait. The plaintiff's skin was noted as intact, and the restraints allowed adequate space between restraints and skin with no skin injuries noted and adequate capillary refill. [Id. at 106].

The plaintiff continued to be assessed on a daily basis due to his continued hunger strike, which began on April 4, 2019, at the Oklahoma Transfer Center. [Doc. 40-1 at 63]. By April 23, 2019, his weight had dropped from 158 on April 9th, to 147 pounds on April

---

[10] At 10:00 a.m., the plaintiff stated: "That's ok, you're not going to take me out of restraints because as soon as I come out, I'm going on suicide watch." [Doc. 40-1 at 198]. At 2:00 p.m., the plaintiff stated: ""I'm not eating. I got something to say. I'll have something to say when I go on suicide watch." [Id.].

22nd. [Id.]. On April 25, 2019, the plaintiff was assessed, and he was in no acute distress and no pain was evident. His skin was normal color, and there was no acute rash, swelling or tenting.  There was no restriction in range of motion of hands, wrist, or feet.  His right wrist had a dorsal scar just proximal to the joint. However, no swelling was appreciated, and no ecchymosis noted. [Id. at 48]. In fact, the first mention of any pain related to the April 17, 2019 incident was on April 25, 2019, when he stated: "they 'bent my surgical wrist' and now 'just a little bull shit pain." [Id. at 45].

Accordingly, the plaintiff has not demonstrated that the force used by BOP staff relating to placement of the plaintiff in ambulatory restraints from approximately 9:44 a.m. until 11:30 p.m. was sufficiently serious so as to violate contemporary standards of decency.  In addition, it is clear that the force used and placement in ambulatory restraints was applied in a good faith effort to restore discipline rather than maliciously and sadistically to cause harm. Therefore, the plaintiff has failed to establish either factor to state an Eighth Amendment claim.  Accordingly, his complaint as it relates to this incident should be dismissed.

## B.     False Incident Report

The plaintiff alleges that Incident Report Number 3246747, which was issued on April 17, 2019, after he was placed in ambulatory restraints, resulted from falsification and misrepresentation of official documents by defendants Bishoff and Gainer in violation of the Fourth Amendment.  It appears that the plaintiff is alleging that the Incident Report was created "after the fact" to justify the "calculated use of force" and his placement in ambulatory restraints.

17

As previously noted, the plaintiff filed this action under ***Bivens***, which is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. *See **Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics***, 403 U.S. 388, 395–97 (1971). ***Bivens*** core premise is to deter individual officers' unconstitutional acts. ***Correctional Services Corp v. Malesko***, 534 U.S. 61 (2001).

"The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." ***Lewis v. Viton***, 2007 WL 2362587, at *9 (D.N.J. Aug. 14, 2007) (citing ***Freeman v. Rideout***, 808 F.2d 949, 962–63 (2d Cir. 1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected interest")).   There is simply no constitutional right to be free from being falsely accused. *See **McClay v. Fowlkes***, 2008 WL 3992637, at *4 n.6 (E.D. Va. Aug. 27, 2008) (O'Grady, J.) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a § 1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being false or wrongfully accused of conduct which may result in the deprivation of a protected liberty interest.") (internal citations omitted); ***Anderson v. Green***, 2009 WL 2711885, at *4 (D. Md. Aug. 24, 2009) (Davis, J.) (same); ***Riggerman v. Ziegler***, 2012 WL 4119674, at *5 (S.D. W.Va, Aug. 22, 2012) (Vandervort, M.J.) ("Inmates have no constitutional right prohibiting false charges against them"), *recommendation adopted in* 2012 WL 4119931 (S.D. W.Va. Sept. 19, 2012) (Berger, J.); ***Caver v. Lane***, 2015 WL 9077032, at *2 (N.D. W.Va. Dec. 16, 2015) (Stamp, J.) (plaintiff has no constitutional right prohibiting false disciplinary charges);

18

*Woods v. United States*, 2012 WL 1005010, n. 5 (W.D. Va. Mar. 22, 2012) (Conrad, C.J.) (plaintiff "has no actionable constitutional claim based on his allegations of 'false' disciplinary convictions"). Rather, they have the right to refute such charges utilizing the procedural due process protections enunciated in *Wolf v. McDonnell*, 418 U.S. 539 (1974). Accordingly, the plaintiff's claim regarding a "false incident report" is due to be dismissed.

**C.**    **Fourth and Fifth Amendment Allegations**

In 42 U.S.C. § 1983, Congress provided a specific damage remedy for plaintiffs whose constitutional rights were violated by state officials, but Congress provided no corresponding remedy for constitutional violations by agents of the Federal Government. Eventually, the Supreme Court issued its opinion in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) and recognized for the first time an implied right of action for damages against federal officers to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. 403 U.S. 388, 397 (1971). The Court acknowledged that the Fourth Amendment does not  provide for money damages "in so many words." *Id*. at 396. The Court noted, however, that Congress had not foreclosed a damages remedy in "explicit" terms and no "specific factors" suggested that the Judiciary should "hesitat[e] in the face of congressional silence." *Id*. at 396–97. Accordingly, the Court held that it could authorize a remedy under general principles of federal jurisdiction. *See id*. at 392. Over the next nine years, the Court allowed *Bivens*-type remedies twice more, in a Fifth Amendment gender discrimination case, *Davis v. Passerman*, 422 U.S. 228 (1979) (an

19

administrative assistant sued a Congressman for firing her because she was a woman),
and in an Eighth Amendment cruel and unusual punishment clause case, *Carlson v.*
*Green*, 446 U.S. 14 (1980) (a prisoner's estate sued federal jailers for failing to treat the
prisoner's asthma).

For nearly four decades, the Supreme Court has "consistently refused to extend
*Bivens* to any new context or new category of defendants." *Ziglar v. Abbasi*, 137 S.Ct.
1843, 1857 (2017) (citations omitted) (emphasis added). Moreover, in *Abbasi*, the
Supreme Court reiterated the significant limits to *Bivens* liability, cautioning courts to first
consider whether to imply a remedy at all before reaching the merits of such claims. 137
S.Ct. 1843 (2017). The court left no doubt that expanding the personal liability associated
with *Bivens* is "a 'disfavored' judicial activity." *Id*. at 1857 (citations omitted). The Court
specifically noted that "in light of the changes" to its "general approach" to "implied
damages remedies," the analysis in *Bivens*, *Davis*, and *Carlson* might be "different if they
were decided today." *Id*. at 1856. *See also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61,
67 & n. 3 (2001) (noting that *Bivens* relied "largely on earlier decisions implying private
damages actions into federal statutes" from which the Supreme Court has since
"retreated.").

As this Court recently noted, *Abbasi* "marked a substantial shift in how courts are
to interpret allegedly unconstitutional acts by federal actors when there is no statute
permitting a damages remedy." *Holloway v. Coakley, et al.*, Case No. 2:17-CV-74, Order
Dismissing Case, Doc. 73 (N.D. W.Va. Apr. 8, 2019) (Bailey, J.). Specifically, *Abbasi*
"narrowed the circumstances in which a plaintiff may successfully state a claim under

principles established in *Bivens*." *Atkinson v. Holder*, 2019 WL 1292886, at *11 (4th Cir. Mar. 21, 2019) (citing *Abbasi*, 137 S.Ct. at 1857–58).

After *Abbasi*, there  is now a two-step test when deciding whether a cognizable *Bivens* remedy exists for alleged official misconduct. First, a court must determine whether the claim presents a "new" *Bivens* context. *Id.* at 1859. If it does, the court must assess whether any "special factors counsel[ ] hesitation" in recognizing a new remedy "in the absence of affirmative action by Congress." *Id.* at 1857, 1859. Therefore, if the *Bivens* claim meaningfully differs from "a claim against an FBI agent for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; [or] a claim against prison officials for failure to treat an inmate's asthma," it is a new context. *Id.* at 1860.

The factual allegations in this case present a new context.  *Bivens* itself was a Fourth Amendment claim, and *Davis* was a Fifth Amendment case, but a claim may still arise in a new context even when the same right is invoked. *Hernandez v. Mesa*, 140 S.Ct. 735, 743. (2020). Although the plaintiff baldly asserts that his claims do not present a new context, under the Supreme Court's analysis, they plainly do.  The plaintiff's claim under the Fourth Amendment presents a new category of defendants than did Bivens' Fourth Amendment suit (prison officials rather than Bureau of Narcotics agents), and this Fourth Amendment claim arises in a new context (a prison rather than a private residence). Likewise, the plaintiff's Fifth Amendment claim differs from Davis' claims and presents a new category of defendants (prison officials rather than a member of Congress) and arises in a new context (a prison rather than a congressional office). These are meaningful

differences.  Admittedly, *Carlson* addressed a prison setting in the context of an Eighth Amendment inadequate medical care.  However, according to the Supreme Court, "even a modest extension is still an extension." *Abbasi*, 137 S. Ct. at 1864.  In this case, the plaintiff's claims challenge conduct arguably within the realm of the prison's safety and security procedures, which is very different than prison medical care because it implicates different concerns and requires additional deference to prison administrators.

Because the plaintiff's claim arises in a new context, this Court must determine whether special factors instruct against recognizing a new *Bivens* action. *Hernandez*, 140 S.Ct. at 743. *Abbasi* demonstrates that alternatives may restrict the Judiciary's need to create a new damages remedy. *See id*. at 1865 ("[T]he existence of alternative remedies usually precludes a court from authorizing a Bivens action."). This is true even where that alternative provides incomplete relief or no relief at all. *Id*. at 1858 (citations omitted); *Bush v. Lucas*, 462 U.S. 367, 385–88 (1983) (creation of a *Bivens* remedy does not hinge on whether an alternative, existing process offers "complete relief for the plaintiff"); *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

Congress specifically created an alternative process for prisoners to address grievances when it passed the Prison Litigation Reform Act ("PLRA") to limit prisoner litigation. *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 171 (4th Cir. 1999), *Woodford v. Ngo*, 548 U.S. 81, 94 (2006). The PLRA reflects a legislative determination that "this country needs … fewer and better prisoner [law] suits." *McLean v. United States*, 566 F.3d 391, 403 (4th Cir. 2009) (quoting *Jones v. Bock*, 549 U.S. 199, 203 (2007)). The PLRA seeks to limit inmate litigation and to remove federal district

22

courts from the daily operation of prisons. *McLean*, 566 F.3d at 403 (citations omitted). Accordingly, the PLRA created an administrative process that empowers a prisoner to voice concerns about his or her confinement. *Woodford*, 548 U.S. at 94; *See* 28 CFR §§ 542.10–542.19. Specifically, the BOP administrative grievance process "allow[s] an inmate to seek formal review of any aspect of his/her own confinement." 28 CFR § 542.10(a) (emphasis added). Where an inmate is not satisfied with how the staff at his correctional facility responds to his concerns, the inmate can appeal his grievance through several additional levels of review outside of his correctional facility. *See* 28 CFR §§ 542.13–542.15.

Therefore, the plaintiff had alternative methods to pursue his allegations. In fact, many courts have explicitly recognized that the BOP's administrative remedy program is an alternative process that precludes a *Bivens* remedy. *See Begay v. Leap*, 2019 WL 1318410, at *3 (N.D. Tex. Feb. 26, 2019) (citations omitted); *Brunson v. Nichols*, 2018 WL 7286410, at *3 (W.D. La. Dec. 7, 2018) (citing *Vega v. United States*, 881 F.3rd 1146 (9th Cir. 2018)); *Gonzalez v. Hasty*, 269 F.Supp.3d 45, 60 (E.D. N.Y. 2017); *Andrews v. Miner*, 301 F.Supp.3d 1128 (N.D. Ala. Aug. 25, 2017) (Coogler, J.); *Mohammed v. Gherke*, 2018 WL 1334936, at *4 (S.D. Ind. Mar. 5, 2018); *Ashford v. Travesio*, 2018 LEXIS 18500, at *12 (D. Ariz. Feb 2, 2018); *Buenrostro v. Fajardo*, 2017 WL 6033469, at *3 (E.D. Cal. Dec. 5, 2017); *Crowder v. Jones*, 2017 WL 5889717, at *3 (S.D. Ind. Nov. 29, 2017).

Regardless of whether an alternative remedy exists, a *Bivens* remedy should not be extended where "there are 'special factors compelling hesitation in the absence of

affirmative action by Congress.'" *Abbasi*, 137 S.Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). Although the Supreme Court has not defined what constitutes "special factors counseling hesitation," the Court has observed that "[t]he necessary inference… is that the inquiry must concentrate on whether the Judiciary is well-suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857–58. Put simply, "a factor must cause a court to hesitate before answering that question in the affirmative." *Id*. at 1858. "[L]egislative action suggesting that Congress does not want to afford a damage remedy is itself a factor counseling hesitation." *Id*. at 1865. The *Abbasi* Court explained that since Congress did not provide for a stand-alone damages remedy against federal jailers when it passed the PLRA, "[i]t could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id*.   The Supreme Court explained as follows:

> Some 15 years after Carlson was decided, Congress passed the [PLRA] of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs.

*Id*.

Additionally, the Supreme Court has stated that "courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safely*,

482 U.S. 78, 84 (1987) (citation omitted). The Supreme Court explained that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id*. Since prison administration is a task that has been committed to the responsibility of the legislative and executive branches of government, the Supreme Court has stated that "separation of powers concerns counsel a policy of judicial restraint." *Id*. 482 US at 85, *see also* **Hernandez**, 140 S.Ct. at 743 ("We have not attempted to 'create an exhaustive list' of factors that may provide a reason not to extend **Bivens**, but we have explained that 'central to [this] analysis' are 'separation-of-powers principles.'"). Therefore, the foregoing supports a finding that Congress has been active in creating legislation regarding prisoner litigation and such causes the Court hesitation as to expanding **Bivens** to the plaintiff's Fourth and Fifth amendment claims. *See* **Muhammad v. Gehrke**, 2018 WL 1334936, at *4 (S.D. Ind. Mar. 15, 2018) (finding Congress has been active in the area prisoner's rights, and its actions do not support the creation of a new **Bivens** claim). **Gonzalez**, 269 F.Supp.3d at 61 (same).

In addition, the **Abbasi** Court explained that "the decision to recognize a damage remedy requires an assessment of his impact on governmental operations systemwide." **Abbasi**, 137 U.S. at 1858. The impact on governmental operations systemwide include "the burdens on Government employees who were sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal systems are used to bring about the proper formulation and implementation of public policies." *Id*. The Supreme Court has emphasized that

"'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf." *Wilkie* 551 U.S. at 562 (quoting *Bush*, 462 U.S. at 389).  In *Abbasi*, the Supreme Court explained further:

> Claims against federal officials often create substantial costs, in the form of defense and indemnification. Congress, then, has a substantial responsibility to determine whether, and the extent to which, monetary and other liability should be imposed upon individual officers and employees of the Federal Government. In addition, the time in administrative costs attendant upon intrusions resulting from the discovery and trial process are significant factors to be considered.

*Abbasi*, 137 U.S. at 1856. The Court notes that expanding *Bivens* to allow such Fourth and Fifth amendment claims by inmates clearly would result in an increase of suits by inmates. This increase in suits would result in an increase litigation costs to the Government and impose a burden upon individual employees to defend such claims. As stated above, Congress recognized the need of reducing costs related to frivolous lawsuits by prisoners when it enacted the PLRA. Therefore, the costs of defending such litigation against the need for damages as a remedy to protect a prisoner's rights must be balanced if *Bivens* liability is extended to Fourth and Fifth Amendment claims. This is exactly the type of activity that the Supreme Court determined in *Abbasi* is better left to the legislative branch.

Therefore, the Court finds that there are special factors counseling hesitation as to the expansion of *Bivens* to the plaintiff's Fourth or Fifth Amendment claim.  Accordingly,

the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, will be granted as to these claims.

### V. <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss, or Alternatively, Motion for Summary Judgment [**Doc. 39**] be **GRANTED in PART and DENIED in PART,** and the plaintiff's Complaint [**Doc. 1**] be **DENIED** and **DISMISSED with prejudice except for his claim against B. Gainer as it relates to his excessive force claim**.

It is so **ORDERED**.

The Clerk is directed to mail a copy of this Order to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

**DATED**: June 16, 2022.



**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**